**Reversed in Part and Affirmed in Part as Modified and Opinion Filed September 30, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00419-CR**

**EDWIN NOEL HERNANDEZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-2115517-I**

# MEMORANDUM OPINION

Before Justices Goldstein, Garcia, and Miskel
Opinion by Justice Goldstein

Edwin Noel Hernandez appeals his capital murder conviction following a jury trial. In seven issues, appellant challenges (Issues 1–2) the sufficiency of the evidence to support his conviction; (Issue 3) the trial court's assumption of jurisdiction and the juvenile court's waiver of jurisdiction; (Issues 4–5) various provisions of the jury charge; (Issue 6) the trial court's denial of his motion to suppress his video-recorded statement to the police; and (Issue 7) the trial court's failure to properly credit his time served. The State raises three cross-points relative to errors in the judgment and argues that if we find the judgment inaccurate, these

errors should be resolved by the trial court. We modify the judgment, affirm in part, and reverse in part, and remand this cause for recalculation of appellant's time credit and correction of judgment.

## BACKGROUND

On the evening of November 2, 2018, Misael Romero and his uncle Simon Ventura were coming home from work in Ventura's work truck. Ventura owned his own construction business, and Romero worked for him. On the way home, they stopped at a check-cashing business. Romero cashed his weekly work check, while Ventura cashed a $70,000 check to pay his employees the next day. When they arrived home, Ventura temporarily parked the truck in the street, while Romero exited and moved a sedan out of the driveway. Romero then backed the truck into the spot that the sedan was in, and Ventura backed the sedan into the driveway space in front of the truck. Ventura then went to the passenger's side of the truck and began removing his work equipment from the back seat.

A surveillance camera overlooking the driveway captured the above, along with what happened next. Four assailants dressed in dark clothes appeared from around the corner on the opposite side of the street and ran toward the driveway. As the assailants crossed the street toward Ventura and Romero, two of them appeared to be wielding firearms—the first a rifle and the second a handgun. We will refer to the assailants with the same monikers that the State uses: "Shooter" (so named

because he is holding the rifle which he later fires); "Shoeless"[1] (so named because he leaves a shoe at the scene); "Stripe" (named after the prominent horizontal stripe on his hoodie); and "Fourth" (so named because he is the last assailant to arrive at the driveway).

As the assailants approached the truck, they split up. Shooter and Fourth approached the passenger's side of the truck, while Stripe and Shoeless approached the driver's side. Romero appeared not to notice the assailants approaching. According to Ventura, the two assailants who approached his side of the truck demanded in Spanish "to give them everything I had." He said that one of the men was pointing a pistol at him. Ventura testified that he dropped his bag, which contained the $70,000 in cash, and attempted to kick it under the truck. Meanwhile, on the passenger's side, Shooter made his way behind Romero, while Fourth stood near the front of the truck.

A scuffle ensued on the driver's side, and Fourth moved from the front of the truck to the driver's side to join the scuffle. Romero, without apparent realization that Shooter was behind him, dropped his equipment and ran to the driver's side to help his uncle. By the time he arrived, the scuffle had moved down the driveway toward the front of the truck, and Fourth began running away across the street in the same direction from which they came. Romero joined the scuffle, tackling one of

---

[1] Appellant was identified as Shoeless, and we may refer to him as one or the other depending on context. Appellant does not challenge his identity as Shoeless on appeal, just that portion of his confession that places him at the scene wearing the shoe, which we address under Issue 6.

the remaining assailants. Meanwhile, Shooter ran around to the front of the sedan. Stripe then exited the scuffle, leaving Shoeless as the only remaining assailant on the ground. Shooter, now in the middle of the street, looked back at the scuffle and raised his rifle. Shooter fired two shots into the scuffle. The surveillance footage then shows Shoeless getting out of the scuffle and, along with Shooter and Stripe, running back across the street behind Fourth.

Ventura's son, Alexis, witnessed some of these events when he came out to help Ventura unload the truck. When Alexis saw the shooting, he ran inside to call 911. Multiple officers and paramedics were dispatched to the scene, including Officer Mohammad Almas of the Garland Police Department (GPD). Officer Almas testified that he saw Romero sitting on a chair in the driveway being tended to by others. He stated that soon after his arrival on the scene, paramedics arrived and transported Romero to the hospital, where he was pronounced deceased. Dr. Stephen Lenfest, a Dallas County medical examiner, testified that Romero suffered a rifle wound and that the bullet entered Romero's right armpit, fractured his ribs, and penetrated his right lung, diaphragm, liver, and right kidney. Dr. Lenfest determined that the cause of death was "rifle wound of the chest into the abdomen."

Officer Almas questioned witnesses at the scene. Alexis showed Officer Almas the surveillance footage discussed above, and Officer Almas testified that it appeared that the four assailants were working together and that it "seemed organized." He based this conclusion on the facts that the assailants approached the

driveway and split up in pairs immediately after Ventura parked his truck. Officer Almas also testified that it appeared that the assailants identified above as Shooter and Shoeless were wielding weapons—a rifle and handgun respectively—as they approached. He said that although he believed Shooter intended to fire the rifle, he did not think doing so was "necessary for the escape."

Audrey Palmer, a forensic investigator with the GPD, arrived on the scene and began her investigation. Palmer testified that she collected two spent shell casings, one live round, a shoe, and a pair of sunglasses. The shell casings were .223 rifle ammunition and were later determined to have been fired from the same weapon. The live round was a .380 caliber bullet, which Investigator Palmer testified was a common handgun caliber. The shoe was a size 8.5 green and white Nike Air Max. Palmer also took several pictures of shoe impressions left in the dirt in a construction site across the street in the direction that the video showed the four assailants approaching from. At trial, Stephen Favela, a forensic scientist with the Texas Department of Public Safety's crime laboratory, testified that the shoe impressions matched those of the Nike Air Max shoe left at the scene.

Approximately, a year after the offense, in November 2019, Detective Bobby Hill of the GPD was assigned as lead investigator in the now "cold" case. Detective Hill reviewed the file and noted that the shoe had not yet been tested for DNA

evidence, so he sent it to the Garland DPS lab for testing.[2] DNA was discovered in the shoe and compared with DNA profiles in the federal CODIS database, which resulted in a "possible hit" as belonging to appellant.[3] Once Detective Hill had appellant's name, he requested that the DPS crime analysts do a "crime workup" on him, which included reviewing appellant's social media profiles. That investigation uncovered photographs of appellant, published to his Facebook profile, which depicted him wearing the same brand and color shoe as the one left behind in Ventura's driveway. Based on this information, Detective Hill obtained a warrant for appellant's DNA, and the subsequent test results confirmed that the DNA on the shoe belonged to appellant.

Detective Hill then conducted an interview with appellant, with appellant's mother present.[4] Detective Hill informed appellant that he was not under arrest and that he could leave at any point.[5] Detective Hill asked appellant about the robbery, and appellant initially answered that he had no involvement. When confronted with the DNA evidence from the shoe, appellant stated that he used to own a pair of shoes

---

[2] *See* TEX. CODE CRIM. PROC. ANN. art. 38.43(a)(2)(A), (B) (defining "biological evidence" to include biological material collected in a felony investigation that might reasonably be used to "establish the identity of the person committing the offense" or "exclude a person from a group of persons who could have committed the offense.").

[3] The shoe had DNA from three different persons, appellant being one, the others unidentified.

[4] Appellant was a juvenile at the time of the offense but over the age of 18 at time of the interview and trial.

[5] Detective Hill testified that he "was told that I need to treat him as a juvenile and do a noncustodial interview. When we do noncustodial interviews, we don't arrest the person at the time the interview was done."

like the one recovered from the scene, but he often let others borrow those shoes. Over the course of the interview, however, appellant changed his story and admitted being present. He further admitted that he and the other assailants were there to commit a robbery, that they waited at a nearby construction site for Ventura and Romero to arrive home, and that they were armed (though he denied being armed himself). Asked about the remaining assailants, appellant declined to identify them.

As appellant was sixteen years old at the time of the robbery and shooting, his case was assigned to the Dallas County Juvenile District Court. On the State's petition, the juvenile court voluntarily waived jurisdiction and transferred the case to the trial court. Appellant was indicted for capital murder and aggravated robbery, to which he pleaded not guilty. Prior to trial, appellant filed a motion to suppress his confession, which the trial court denied. A jury trial commenced on April 26, 2022. The jury returned a verdict of guilty on the charge of capital murder.[6] The trial court entered its judgment of guilt and assessed punishment at life imprisonment with the possibility of parole after forty years. This appeal followed.

---

[6] The jury also found appellant guilty of aggravated assault, which was charged by indictment in a separate cause number. After the guilty verdict, appellant entered into a plea bargain agreement with the State in that cause. Under that agreement, appellant agreed to waive his right to appeal the conviction for aggravated assault in exchange for a sentence of ten years' confinement for that offense.

# DISCUSSION

## I. JURISDICTION

In his third issue, appellant contends that the trial court lacked jurisdiction. We address this issue first as it is potentially dispositive of the appeal. Appellant argues that because he was sixteen years old at the time of the offense, the juvenile court had jurisdiction and there is no evidence in the record establishing the juvenile court's waiver, or the trial court's assumption, of jurisdiction. Appellant concludes that the trial court's judgment is therefore void for want of jurisdiction.

In Texas, juvenile courts have jurisdiction to adjudicate the guilt of persons who commit crimes prior to the age of seventeen. *See* TEX. PENAL CODE ANN. § 8.07(b). However, a juvenile court may waive jurisdiction and transfer a case to a criminal court if the defendant was over fourteen years old and alleged to have committed, *inter alia*, a capital felony and the juvenile court determines after a full investigation and hearing that there is probable cause to believe that the defendant committed the alleged offense and that "because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings." *See* TEX. FAM. CODE ANN. § 54.02(a).

Here, appellant complains that there is no evidence in the record that the juvenile court made the necessary findings, entered an order waiving its own jurisdiction, or entered an order transferring the case to the trial court. After appellant filed his brief making this argument, the State requested that the record be

–8–

supplemented with the juvenile court's records. On the State's motion, we ordered the District Clerk to supplement the record with the following documents from the juvenile court's files: (1) the State's petition for discretionary transfer; (2) the juvenile court's order of commitment after discretionary transfer hearing; and (3) the juvenile court's waiver of jurisdiction and order of transfer. The District Clerk filed these documents with our Court as a supplemental clerk's record. The State then filed its brief arguing that appellant's third issue is moot because the appellate record now contains documents that appellant argued were lacking. In his reply brief, appellant argued that we cannot consider the documents as part of the appellate record because they are not records of the trial court and were not part of the trial court's record when it exercised jurisdiction.

We reject appellant's argument and conclude that he failed to preserve this argument for appeal. Article 4.18 of the Code of Criminal Procedure provides, in part:

(a) A claim that a district court or criminal district court does not have jurisdiction over a person because jurisdiction is exclusively in the juvenile court and that the juvenile court could not waive jurisdiction under Section 8.07(a), Penal Code, or did not waive jurisdiction under Section 8.07(b), Penal Code, must be made by written motion in bar of prosecution filed with the court in which criminal charges against the person are filed.

(b) The motion must be filed and presented to the presiding judge of the court:

(1) if the defendant enters a plea of guilty or no contest, before the plea;

–9–

(2) if the defendant's guilt or punishment is tried or determined by a jury, before selection of the jury begins; or

(3) if the defendant's guilt is tried by the court, before the first witness is sworn.

(c) Unless the motion is not contested, the presiding judge shall promptly conduct a hearing without a jury and rule on the motion. The party making the motion has the burden of establishing by a preponderance of the evidence those facts necessary for the motion to prevail.

(d) A person may not contest the jurisdiction of the court on the ground that the juvenile court has exclusive jurisdiction if:

(1) the person does not file a motion within the time requirements of this article; or

(2) the presiding judge finds under Subsection (c) that a motion made under this article does not prevail.

TEX. CODE CRIM. PROC. ANN. art. 4.18. Appellant's claim that there is no evidence that the juvenile court waived jurisdiction is tantamount to a claim that the trial court lacked jurisdiction because "the juvenile court . . . did not waive jurisdiction under Section 8.07(b)" of the Penal Code. *See id.* art. 4.18(a). Appellant was required to raise this claim by written motion before jury selection. *See id.* art. 4.18(b)(2); *see also Rushing v. State*, 85 S.W.3d 283, 284 (Tex. Crim. App. 2002) (noting that the defendant argued on appeal that "the record did not reflect that a juvenile court had waived jurisdiction" but that Article 4.18 "purports to bar this type of claim unless it is timely raised before the convicting court—and appellant had failed to do so").

In the reply brief,[7] appellant argues in the alternative that, even if we do consider the supplemental clerk's record, "the State failed to prove that the jurisdiction of the juvenile court was effectively waived or transferred." Appellant relies on Section 54.02, subsection (j) of the Family Code, which provides:

> The juvenile court may waive its exclusive original jurisdiction and transfer a person to the appropriate district court or criminal district court for criminal proceedings if:
>
> (1) the person is 18 years of age or older;
>
> (2) the person was:
>
>> (A) 10 years of age or older and under 17 years of age at the time the person is alleged to have committed a capital felony or an offense under Section 19.02, Penal Code;
>>
>> (B) 14 years of age or older and under 17 years of age at the time the person is alleged to have committed an aggravated controlled substance felony or a felony of the first degree other than an offense under Section 19.02, Penal Code; or
>>
>> (C) 15 years of age or older and under 17 years of age at the time the person is alleged to have committed a felony of the second or third degree or a state jail felony;

---

[7] Ordinarily, we do not consider arguments raised for the first time in a reply brief. *State v. West*, 20 S.W.3d 867, 873 (Tex. App.—Dallas 2000, pet. ref'd). Here, however, appellant raised this argument after the State supplemented the clerk's record with the documents from the juvenile court. Thus appellant's reply brief was his first opportunity to address the juvenile court's findings. Additionally, unlike appellant's primary argument under this issue, Article 4.18 does not bar appellant from raising this issue for the first time on appeal. *See* TEX. CODE CRIM. PROC. art. 4.18(g) ("This article does not apply to a claim of a defect or error in a discretionary transfer proceeding in juvenile court."); *see also Davis v. State*, No. 05-16-01341-CR, 2018 WL 3629085, at *3 (Tex. App.—Dallas July 31, 2018, no pet.) (mem. op., not designated for publication) (holding that Article 4.18 did not bar the defendant from asserting on appeal that his conviction was void on the ground that the juvenile court abused its discretion in failing to make adequate case-specific findings in its transfer order).

–11–

(3) no adjudication concerning the alleged offense has been made or no adjudication hearing concerning the offense has been conducted;

(4) the juvenile court finds from a preponderance of the evidence that:

(A) for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person; or

(B) after due diligence of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person because:

(i) the state did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of the person;

(ii) the person could not be found; or

(iii) a previous transfer order was reversed by an appellate court or set aside by a district court; and

(5) the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged.

TEX. FAM. CODE ANN. § 54.02(j). Appellant contends that "a finding—based on a preponderance of the evidence under Tex. Fam. Code § 54.02(j)(4)(A) or (B)—was essential to a valid transfer order." However, appellant argues, the juvenile court's findings under the above provisions were "dubious" and rendered the transfer order "so deficient as to deprive the criminal court of jurisdiction." *See Ex parte Moon*, 667 S.W.3d 796, 805 (Tex. Crim. App. 2023).

Assuming without deciding that the juvenile court's findings under Section 54.02(j) were deficient, we nevertheless reject appellant's argument. The juvenile court found that transfer of the case to the trial court was appropriate not only under subsection (j), but also under subsection (a). These provisions both provide that a juvenile court "may waive its exclusive original jurisdiction" but differ on the findings the trial court could make before doing so. *See id.* § 54.02(a), (j). They are therefore alternative grounds for transfer. Under subsection (a), a juvenile court may transfer a case to a criminal court if the juvenile was over fourteen years old at the time of the offense, is alleged to have committed a capital felony, and the juvenile court determines after a full investigation and hearing that there is probable cause to believe that the defendant committed the alleged offense and that "because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings." *See* TEX. FAM. CODE ANN. § 54.02(a). Here, the juvenile court made specific findings spanning roughly three pages of its transfer order in support of its decision to waive jurisdiction. The juvenile court concluded that there was probable cause that appellant committed the alleged aggravated robbery and capital murder. Appellant does not complain of these findings. We therefore conclude that the juvenile court did not abuse its jurisdiction in waiving jurisdiction and transferring the case to the trial court.

Appellant did not timely raise an objection to the trial court's assumption of jurisdiction, including the challenged lack of documentation from the juvenile court,

–13–

prior to voir dire;  therefore we conclude that appellant failed to preserve this error for appeal. We overrule appellant's third issue.

## II.  LEGAL SUFFICIENCY

Appellant states his first two issues as follows:

> Issue 1: The evidence was legally insufficient to prove Capital Murder because the evidence: (1) did not support a rational finding that Hernandez "should have anticipated" the shooting of [Romero], a necessary element of guilt under Tex. Penal Code § 7.02(b); and (2) did not support the conclusion that the shooter committed the murder in the course of a robbery attempt.

> Issue 2: The jury's finding that the death of [Romero] occurred in the course of an attempt to deprive [Romero] of property was not supported by legally sufficient evidence.

As both of these issues raise legal-sufficiency challenges to the evidence supporting the verdict, we will consider them together.

### A.  Standard of Review

When reviewing the sufficiency of the evidence, we consider all the admitted evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). We measure the cumulative force of the evidence against "the hypothetically-correct jury charge, defined by the statutory elements as modified by the charging instrument." *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). "The hypothetically-correct jury charge is one that accurately states the law, is authorized by the indictment, does not increase the State's burden

–14–

of proof, and adequately describes the offense with which the defendant is charged."

*Id.* at 574–75.

The jury is the sole judge of the credibility of a witness's testimony and the weight to assign that testimony. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Thus, the jury can believe all, some, or none of a witness's testimony. *Id.* If the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012). We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

In a legal-sufficiency analysis, we treat direct and circumstantial evidence equally under this standard. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating

circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.     Applicable Law**

A person commits capital murder if the person commits murder and, *inter alia*, the person intentionally commits the murder in the course of committing or attempting to commit robbery or certain other offenses. TEX. PENAL CODE ANN. § 19.03(a)(3). The phrase "in the course of" refers to "conduct occurring during an attempt to commit, during the commission of, or in immediate flight from, the forbidden behavior." *Griffin v. State*, 491 S.W.3d 771, 774–75 (Tex. Crim. App. 2016).

A person commits murder if the person intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person commits the offense of robbery if, in the course of unlawfully appropriating property with the intent to deprive the owner of property, and with the intent to obtain or maintain control of the property, intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a)(2).

Under the law of the parties, a person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another

–16–

for which he is criminally responsible, or by both." *Id.* § 7.01(a). Under Section

7.02(a) of the Penal Code, party liability attaches to a defendant if:

> (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
>
> (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

*Id.* § 7.02(a). Additionally, under Section 7.02(b), party liability attaches to co-

conspirators as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).[8]

"To determine whether an individual is a party to an offense, the reviewing

court may look to 'events before, during, and after the commission of the offense.'"

*Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*,

---

[8] In 2023, the Legislature amended Section 7.02(b) by adding the following sentence: "In this subsection, "conspiracy" means an agreement between two or more persons to commit a felony." *See* Acts 2023, 88th Leg., ch. 735 (H.B. 2961), § 1, eff. Sept. 1, 2023. However, according to the Act, the change became effective on September 1, 2023 and applied only to offenses committed after that effective date. *See id.* § 2, 3. As the charged offense occurred in 2018, we do not consider the amended definition in our analysis.

555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). "A court may also rely on circumstantial evidence to prove party status." *Id.* "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties." *Id.* However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense. *Id.*

### C.     Analysis

Appellant does not dispute that Romero was murdered or that an attempted robbery took place. Rather, in his first two issues, appellant complains that the evidence was insufficient to show that (1) appellant was a conspirator to the attempted robbery; (2) the murder happened in the course of an attempted robbery; (3) appellant should have anticipated a shooting; (4) Romero was a victim of aggravated robbery; and (5) the shooter had a propensity for violence. We address each complaint in turn.

#### 1.     *Issue 2(a)—Appellant as Conspirator*

Appellant first contends that the evidence was legally insufficient to prove that he was a conspirator to the robbery. Appellant argues that there was insufficient evidence of his "understanding and agreement" to commit the robbery because there was no evidence that "the parties were acting together, each doing some part of the execution or the common purpose." *See Metcalf v. State*, 597 S.W.3d 847, 854 (Tex.

–18–

Crim. App. 2020). Appellant explains that his presence at the scene of the robbery was not, in itself, sufficient to show that he was a coconspirator:

> Further, proof only that Hernandez went along with others to the scene of the robbery does not allow an inference that he agreed to participate with them since he could merely have been an observer or be present to engage in his own criminal conduct rather than the offense intended by the others.

We disagree with appellant's characterization of the evidence and the inferences the jury could have drawn from it.

Here, the State sought submission of an instruction regarding the law of the parties under subsections (a)(2) and (b) of Penal Code Section 7.02,[9] only the latter of which requires a "conspiracy" to commit a felony. *See* TEX. PENAL CODE ANN. § 7.02(b). Contrary to appellant's assertion, the conspiracy element of coconspirator liability under Penal Code Section 7.02(b) is not the same as criminal conspiracy under Section 15.02. *See Huff v. State*, No. 02-22-00139-CR, 2023 WL 3643232, at

---

[9] Appellant argues that Section 7.02(a)(2) does not apply here because there was no evidence that he intended to promote or assist the commission of Romero's murder. The State disagrees, explaining that the jury could have found that .380 caliber bullet left behind at the scene was from the handgun that was wielded by Shoeless (i.e., appellant). According to Detective Hill, the only way to eject a bullet is to "rack"—or pull back—the slide of the handgun. The State argues that the jury could have concluded that appellant racked his gun in order to fire it, meaning that he had the requisite intent to commit murder. We need not address these arguments. Because we conclude that the evidence was sufficient to support appellant's conviction as a conspirator under the party-liability theory set forth in Section 7.02(b), we do not opine as to the sufficiency of the evidence with respect to Section 7.02(a)(2). *See Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992) ("[W]hen the jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld."); *see also, e.g.*, *Manning v. State*, No. 01-04-00866-CR, 2006 WL 2506777, at *7 (Tex. App.—Houston [1st Dist.] Aug. 31, 2006, pet. ref'd) (mem. op., not designated for publication) ("Based on the foregoing evidence, we hold that the evidence was legally sufficient to support appellant's conviction of capital murder under section 7.02(b). Based on our holding, we need not determine whether legally sufficient evidence showed that appellant intentionally caused the death of Ainsworth under section 19.03(a)(2), or that appellant solicited, encouraged, directed, aided, or attempted to aid a co-conspirator under section 7.02(a)(2).").

*4 (Tex. App.—Fort Worth May 25, 2023, pet. ref'd) (mem. op., not designated for publication) ("Under Section 7.02(b), the conspiracy language is not used to allege the commission of a conspiracy offense under Section 15.02 of the Texas Penal Code but is used to allege a defendant's liability as a party to an offense alleged in the indictment.") (citing *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989); and *Murkledove v. State*, 437 S.W.3d 17, 22–23 (Tex. App.—Fort Worth 2014, pet. ref'd)). To establish a conspiracy under Section 7.02(b), the State must show that the parties made an agreement to commit the underlying offense, which need not be proven by words alone:

> Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense.

*Thompson v. State*, No. 05-17-01173-CR, 2018 WL 4611224, at *3 (Tex. App.—Dallas Sept. 26, 2018, no pet.) (mem. op., not designated for publication) (quoting *Leadon v. State*, 332 S.W.3d 600, 606 (Tex. App.—Houston [1st Dist.] 2010, no pet.)).

From the record, the jury could have inferred that appellant was not merely a mere observer or participant in some other felony as appellant argues, but rather a party to the agreement to commit a robbery. Appellant stated in his recorded interview that he and the other three assailants waited at a nearby construction site for Ventura and Romero to arrive home so they could rob them. An examination of

shoe impressions left at the construction site matched those of the shoe left behind at the scene, which the jury could have inferred belonged to appellant based on the social media photos of him wearing similar shoes. The security-camera footage shows that when Ventura and Romero exited the truck, the four assailants crossed the street in pairs to approach them on either side of the truck. The assailant referred to by the State as Shoeless can be seen in the footage wielding a handgun and pointing it in the direction of the truck. The footage shows him and the assailant referred to as Stripe approached Ventura and, according to Ventura's testimony, one of them demanded that he "give them everything [he] had."

On this record, we conclude the evidence was legally sufficient to show that appellant and the other assailants were parties to a conspiracy to commit a robbery.

### 2.    Issue 2(b)—"In the Course of"

Appellant next contends that the evidence was legally insufficient to show that the murder happened "in the course of" a robbery or attempted robbery. He argues that that there was no nexus between the murder and the robbery because "when the fatal shot was fired, the act of the crime—the robbery—was over." We disagree.

Capital murder under Penal Code Section 19.03(a)(2) is defined as a murder that the accused commits "in the course of" committing or attempting to commit another offense, including robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). The phrase "in the course of" refers to "conduct occurring during an attempt to commit, during the commission of, or in immediate flight from, the forbidden behavior."

–21–

*Griffin*, 491 S.W.3d at 774–75. However, "[a] killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2): the State must prove a nexus between the murder and the theft, i.e. that the murder occurred in order to facilitate the taking of the property." *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986).

Here, the evidence showed that the murder occurred in the course of the robbery. The surveillance footage shows the assailants referred to as Stripe and Shoeless approaching the driver's side of Ventura's truck. A scuffle broke out, and Romero went to that side of the truck and joined the scuffle. The four men were on the ground while Shooter circled around the sedan in front of the truck and aimed his rifle at the scuffle. Stripe was able to escape from the scuffle, but Shoeless was still in it. The footage then shows Shooter firing the rifle twice, after which Shoeless also freed himself. The assailants then fled across the street. Ventura testified that although the bag containing the $70,000 in cash was not taken, the assailants did take Romero's money. On this record, the jury could have reasonably concluded that Shooter murdered Romero "in the immediate flight" from the robbery. Therefore, the evidence was legally sufficient to support the jury's finding that the murder occurred "in the course of" the robbery.

### 3. Issue 2(c)—"Should Have Anticipated"

Appellant argues that there was no evidence that he should have anticipated that the assailant referred to by the State as Shooter would murder Romero. We disagree.

When the evidence shows that a defendant uses, or knows that one of his coconspirators will use, a firearm in the commission of a robbery, such evidence "can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery." *Jones v. State*, No. 05-18-00588-CR, 2019 WL 4071995, at *3 (Tex. App.—Dallas Aug. 29, 2019, pet. ref'd) (mem. op., not designated for publication) (quoting *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)); *see also, e.g.*, *Garcia v. State*, No. 05-22-00526-CR, 2023 WL 4731296, at *6 (Tex. App.—Dallas July 25, 2023, no pet.) (mem. op., not designated for publication) (defendant should have anticipated murders resulting from "confronting and threatening [victims] with a loaded AR15").

Here, the evidence shows that Romero's murder should have been anticipated. Appellant stated in his interview that the four assailants planned to commit a robbery. Appellant also knew that one of the assailants would be wielding a rifle and another a handgun. The surveillance footage shows that two of the assailants, Shooter and Shoeless, pointed the rifle and handgun respectively in the direction of the truck as they approached from across the street. As discussed above, the evidence

was also sufficient to show that Shoeless was appellant. Although appellant did not fire his handgun during the robbery, a bullet from his gun was left at the scene. Detective Hill testified that the only way a bullet could be ejected from a gun is for the wielder to "rack"—or pull back—the slide of the weapon.

On this record, the jury could have reasonably found that appellant knew that a gun would be used in the commission of the robbery. We therefore conclude the evidence was legally sufficient to show that appellant should have anticipated Romero's murder as a result of carrying out the conspiracy to commit the robbery.

### 4.    *Issue 3(a)—Romero as Victim*

Appellant asserts that there is insufficient evidence to show that Romero was a victim of aggravated robbery. Appellant notes that the indictment against him alleges that he caused Romero's death while appellant "was then and there in the course of committing and attempting to commit the offense of robbery of [Romero]." Appellant argues that the State was required to prove that Romero was a victim not only of the murder, but also of the robbery, because that is what the indictment alleges.[10] Appellant contends the State failed to meet this burden because there was

---

[10] This argument raises the issue of variance, which "occurs whenever there is a discrepancy between the allegations in the indictment and the proof offered at trial." *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). Although appellant does not expressly complain about a variance, we discern that the gravamen of his argument under this issue is that the indictment alleged "[Hernandez] was then and there in the course of committing and attempting to commit the offense of ROBBERY of [ Romero]" , but the evidence showed (and the State argued) only that Ventura was the victim of a robbery. Ordinarily, we would consider the materiality of the variance to resolve the legal-sufficiency issue. *See id.* Here, however, we need not do so, because the jury could have reasonably concluded that Romero was, along with Ventura, a victim of the robbery.

–24–

no evidence that the four assailants attempted to rob Romero. The State responds that the underlying offense alleged in the indictment was robbery, not aggravated robbery. The State further points out that there was some evidence that the assailants did in fact steal Romero's money.

To prove capital murder under Penal Code Section 19.03(a)(2), the State was required to prove that Romero was killed in the course of, *inter alia*, a robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). Thus, to the extent appellant argues that the State was required to prove the elements of aggravated robbery as the underlying felony for capital murder, we reject that argument. Alternatively, to the extent appellant argues that there was insufficient evidence that Romero was a victim of the robbery, we disagree. The evidence shows that the four assailants approached Ventura and Romero and split up in pairs to both sides of the truck. Ventura testified that while the assailants did not take the $70,000 in cash, they took money from Romero. Therefore, on this record, the evidence was legally sufficient to show that Romero was the victim of a robbery.

### 5.  *Issue 3(b)—Shooter's Propensity for Violence*

In his final legal-sufficiency challenge, appellant argues that there was insufficient evidence that he "knew the violent propensities of the shooter." For this argument, appellant relies on *Tippitt v. State*, 41 S.W.3d 316, 325–26 (Tex. App.— Fort Worth 2001, no pet.), abrogated by *Hooper v. State*, 214 S.W.3d 9 (Tex. Crim.

App. 2007). The State responds that it was not required to prove appellant's knowledge of the shooter's propensity for violence. We agree with the State.

In *Tippitt*, the Fort Worth Court of Appeals considered the "anticipation" element of coconspirator liability under Penal Code Section 7.02(b). The court held that the evidence was insufficient to show that Tippitt should have anticipated that Whitaker, his coconspirator, would commit a murder during the course of the robbery they conspired to commit. *See id.* After reviewing the relevant case law, the court explained:

> Here, the evidence does not rise to the same level as in those cases where the appellate courts have held that murder should have been anticipated as a result of carrying out the object offense. While there was some evidence in our record that, by his reputation, Whitaker might be prone to commit violence, there was no evidence to establish [Tippitt's] knowledge of Whitaker's violent propensities. Moreover, there is no evidence to show that [Tippitt] knew Whitaker had a gun when he entered [the victim'] home. Without such evidence, we cannot hold that the evidence showed, beyond a reasonable doubt, that [Tippitt] should have anticipated intentional murder as a possible result of their agreement to rob [the victim].

*Id.* After *Tippitt*, some courts held that the anticipation element of party liability under Section 7.02(b) requires evidence of the defendant's knowledge of his coconspirator's propensity for violence. *See, e.g.*, *Hooper v. State*, 170 S.W.3d 736, 745 (Tex. App.—Waco 2005, pet. granted) rev'd 214 S.W.3d 9 (Tex. Crim. App. 2007). The court of criminal appeals, however, has held that "[k]nowledge of a co-conspirator's violent propensity or intent to commit aggravated assault is not an element of the offense under either theory of party liability, so the lack of evidence

of such knowledge is not dispositive of sufficiency." *Hooper*, 214 S.W.3d at 14[11]; *see also Kirvin v. State*, No. 05-09-00382-CR, 2010 WL 3259798, at *4 (Tex. App.—Dallas Aug. 16, 2010, pet. ref'd) (mem. op., not designated for publication) ("[A] lack of proof of [the defendant's] knowledge of [the coconspirator's] intent or background is not dispositive of his sufficiency challenge.").

We conclude that the State was not required to show that appellant knew of Shooter's propensity for violence in order to establish that appellant should have anticipated Romero's murder. We therefore do not consider whether the evidence was legally sufficient to establish this fact and overrule appellant's sufficiency challenge on this ground.

### 6. Summary

We conclude that the evidence was legally sufficient to show that (1) appellant was a conspirator to the robbery; (2) Romero's murder occurred in the course of the robbery; (3) appellant should have anticipated that Shooter would commit the murder; and (4) Romero was the victim of the robbery. We further conclude that the State was not required to prove Romero was the victim of an aggravated robbery or that appellant had knowledge of Shooter's propensity for violence.

---

[11] Appellant's citation to *Tippitt* includes a subsequent-history notation that the case was "overruled on other grounds by *Hooper*[.] The court of criminal appeals in *Hooper* did expressly overrule *Tippitt* on a different issue—whether inference stacking can be used to establish a vital fact in a legal-sufficiency analysis. *Hooper*, 214 S.W.3d at 15. However, the court of criminal appeals also rejected the lower court's analysis on the issue of violent propensity. *See id.* at 14. The lower court in *Hooper* relied on *Tippitt* for its reasoning. Thus, to the extent *Tippitt* stands for the proposition that the State must prove the defendant's knowledge of his coconspirator's propensity for violence in such cases, that proposition has been expressly disapproved of by the court of criminal appeals. *See id.*

We overrule appellant's first and second issues.

## III. JURY CHARGE

In his fourth issue, appellant contends that the trial court erred in its charge to the jury because (1) the evidence was insufficient to show that he acted alone and thus no instruction under Penal Code Section 7.02(a)(2) should have been given; (2) the trial court failed to define "conspiracy"; and (3) there were conflicting definitions of "capital murder." In his fifth issue, appellant contends that the trial court erred because the charge included an improper conduct instruction that allowed the jury to find appellant guilty on an inapplicable theory of liability.

### A. Standard of Review

When considering issues of charge error, we conduct a two-step inquiry. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). First, we determine whether the charge is erroneous. *Id.* In examining the charge for possible error, we must "examine the charge as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). Second, if the charge is erroneous, we must decide whether the appellant was harmed by the erroneous charge. *Alcoser*, 663 S.W.3d at 165. The level of harm required to obtain relief on appeal depends on whether the appellant objected at trial. *See id.* If there was a timely objection to the charge, then the appellant needs only to show "some

harm" to obtain relief. *Id.* If there was no objection, then the record must show "egregious harm." *Id.*[12]

"Harm is assessed 'in light of the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.'" *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Almanza*, 686 S.W.2d at 171). "A finding of egregious harm must be based on 'actual harm rather than theoretical harm.'" *Id.* (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). Egregious harm is a difficult standard to meet, and the analysis is a fact-specific one. *Id.* "Neither party bears the burden on appeal to show harm or lack thereof under this standard." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). Instead, courts are required to examine the relevant portions of the entire record to determine whether appellant suffered harm as a result of the error. *Id.*

---

[12] Appellant concedes that other than the following requests, no objections were made to the jury charge. Appellant requested the lesser-included offenses of Murder and Aggravated Robbery be included in the jury charge, along with an instruction addressing the voluntariness of Hernandez's statement to the police and an extraneous-act instruction.

## B.    Applicable Law

Under Article 36.14 of the Code of Criminal Procedure, a trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14. The charge must "contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins*, 894 S.W.2d at 339.

A jury charge consists of two parts: the abstract portion, which tells the jury about the law, and the application portion, which applies the law to the facts and authorizes the jury to act. *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012); *Farris v. State*, 506 S.W.3d 102, 108 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd) (citing *Hutch v. State*, 922 S.W.2d 166, 172–74 (Tex. Crim. App. 1996)). "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Crenshaw*, 378 S.W.3d at 466. The abstract paragraphs serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge. *Id.* "An abstract charge on a theory of law that is not applied to the facts does not authorize the jury to convict upon that theory." *Id.* Generally, reversible error occurs in the giving of an abstract instruction only when the instruction is an incorrect or misleading statement of a law that the jury must understand in order to implement the commands of the application paragraph. *Id.* (citing *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), overruled on other grounds by *Malik v. State*, 953 S.W.2d 234, 239 (Tex. Crim. App.

1997)). Conversely, "superfluous abstractions, those not necessary to an understanding of concepts or terms contained in the application paragraph, are generally innocuous." *Plata*, 926 S.W.2d at 302.

### C.    Analysis

#### 1.    *Issue 4(a)—Section 7.02(a)(2) Instruction*

Appellant argues that the trial court erred in including a law-of-the-parties instruction under Section 7.02(a)(2) of the Penal Code because there was no evidence that he acted alone in causing Romero's death. The State responds that including this instruction was not error because it was supported by the evidence.

A trial court must submit instructions on the law of the parties under any legal theory supported by the evidence. *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). If the evidence supports multiple theories of party liability, the trial judge may not arbitrarily limit the State to one of the theories. *Id.* And the trial judge may not restrict the presentation of a theory of party liability if the restriction is not required by the charging instrument or by the evidence. *Id.*

Here, the jury charge includes instructions regarding the law of the parties under both Sections 7.02(a)(2) and 7.02(b) of the Penal Code.[13] Under a section titled Law of Parties, the charge states:

---

[13] As we concluded above, the evidence was legally sufficient to support appellant's conviction under Section 7.02(b), and we therefore will not opine as to whether the evidence also supported a conviction under Section 7.02(a)(2). *See supra*, at n.3. That does not mean, however, that the State was not entitled to a Section 7.02(a)(2) instruction.

–31–

All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

A person is criminally responsible for conduct of another if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The second paragraph above largely tracks the language of Section 7.02(a)(2), while the third paragraph tracks the language of Section 7.02(b). *See* TEX. PENAL CODE ANN. § 7.02(a)(2), (b). The next section of the charge includes the application paragraph for capital murder, which states (emphasis ours):

Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt, that on or about 2nd day of November, 2018, in Dallas County, Texas, Edwin Hernandez, hereinafter called defendant, *acting alone or as a party as defined herein*, did then and there intentionally cause the death of Misael Romero, an individual, hereinafter called deceased, by shooting the deceased with a firearm, and the defendant was then and there in the course of committing and attempting to commit the offense of robbery of the deceased, then you will find the defendant guilty of capital murder.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, or if you are unable to agree,

–32–

you will next consider whether the defendant is guilty of the lesser offense of murder.

The charge also includes applications paragraphs for the offenses of murder and aggravated robbery, each of which includes the above italicized language referring to the party-liability instruction in the abstract portion of the charge.

Appellant argues that the trial court erred in including the Section 7.02(a) instruction because the evidence was insufficient to show that he acted alone in causing Romero's death. But the inclusion of a Section 7.02(a) instruction does not require that the defendant act alone; rather, the State is entitled to the instruction only if it presents some evidence that the defendant "acting with intent to promote or assist the commission of the [murder], he solicits, encourages, directs, aids, or attempts to aid *the other person* to commit the [murder]." *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

Appellant further argues that "[e]ven if the evidence supported [Section 7.02(a)(2)'s] inclusion, it would primarily serve to distract or confuse the jury." Appellant avers that the trial court erred by instructing the jury on party liability theories under both 7.02(a)(2) and 7.02(b) "without being clear that each theory was exclusive in nature[.]" We disagree. The charge sets forth the two theories in separate paragraphs, and there is no indication that the two paragraphs are interdependent. Further, the party-liability section of the abstract portion is immediately followed by the application paragraph for capital murder, requiring little effort on the part of the jury to connect them. *See Vasquez v. State*, 389 S.W.3d 361, 371 (Tex. Crim. App.

–33–

2012) (application paragraph stating that defendant should be found guilty if he committed aggravated robbery "acting alone or as a party (as herein defined)" not confusing where "jury needed only to refer to the previous section, which defined criminal responsibility as a party"). Further, the trial court was required to include alternate theories of party liability supported by the evidence. *See Weeks*, 391 S.W.3d at 124. And the jury could have convicted on any theory of party liability even if it was not unanimous as to any single theory of party liability. *See Leza v State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011) ("Where, as is the case here, the evidence is compelling that an accused is guilty of every constituent element of the alleged penal offense—either as a principal actor or under some theory of party liability—but there remains evidentiary play with respect to his precise role in that offense, we think it would be plainly absurd to require the jury to acquit the accused unless it can unanimously determine his status as a principal actor or a party and, if the latter, what his exact party accountability might be.").

We conclude the trial court did not err in including a Section 7.02(a)(2) instruction in the charge. Even if it did, we cannot conclude that appellant was egregiously harmed by the error. If appellant is correct that a Section 7.02(a)(2) instruction was unnecessary and unsupported by the evidence, then it would be best described as a "superfluous abstraction[]" that is "not necessary to an understanding of concepts or terms contained in the application paragraph." *See Plata*, 926 S.W.2d at 302. Such instructions "are generally innocuous." *See id.*

### 2. *Issue 4(b)—Conspiracy Definition*

Appellant next contends that the trial court erred by failing to include a definition of "conspiracy" in the charge. Appellant argues that the trial court should have included a definition of conspiracy derived from Section 15.02 of the Penal Code, which defines the offense of criminal conspiracy.

This argument is similar to one rejected by the court of criminal appeals in *Ladd v. State*, 3 S.W.3d 547, 565 (Tex. Crim. App. 1999). In *Ladd*, the defendant was charged with committing capital murder in the course of committing a robbery, among other crimes. *See id.* at 556. The jury charge included an instruction on law of parties under Section 7.02(b). *See id.* at 565. The charge also defined "conspiracy" using its commonly understood meaning. *See id.* The defendant argued that this was error and that the trial court should have defined conspiracy according to the elements of the offense under Penal Code Section 15.02. *See id.* The court of criminal appeals rejected this argument. The court held the trial court did not err, explaining:

> The Penal Code provides no definition for "conspiracy" as that term is used in § 7.02(b). Therefore, the trial court need not have defined the term, but it certainly did not err in instructing the jury to give the term its commonly understood meaning.

*Id.* (internal citations omitted); *see also Huff*, 2023 WL 3643232, at *4 (explaining the difference between conspiracy as used in Sections 7.02(b) and 15.02 of the Penal Code).

At the time of the offense in this case,[14] the Penal Code did not define "conspiracy" as used in Section 7.02(b). *See generally* TEX. PENAL CODE ANN. § 1.07 (definitions). Accordingly, the trial court "need not have defined the term." *See Ladd*, 3 S.W.3d at 565.

We conclude the trial court did not err by failing to define the word "conspiracy" in the charge. Accordingly, we do not address whether appellant was harmed by the omission. *See Alcoser*, 663 S.W.3d at 165.

### 3. *Issue 4(c)—Definition of Capital Murder*

Appellant next complains about the following definition of capital murder in the abstract portion of the charge:

> A person commits the offense of capital murder if he intentionally causes the death of an individual; and the defendant was then in there in the course of committing and attempting to commit the offense robbery of said deceased.

Appellant argues that this definition was "no help in deciding the case" because the case "dealt exclusively with [appellant's] criminal responsibility for another's conduct and nothing else should have been implied or stated." The State responds that the above definition tracks the language of the charged offense and therefore its inclusion in the charge cannot be error.

---

[14] We note again that Section 7.02(b) does include a definition of "conspiracy" as of September 1, 2023. *See supra*, at n.2. However, the offense here predated the effective date of that amendment and we thus do not rely on the statutory definition in this analysis. *See id.*

We agree with the State. A trial court generally does not commit charge error in defining an offense by tracking the statutory language. *Casey v. State*, 215 S.W.3d 870, 887 (Tex. Crim. App. 2007). Additionally, we disagree that the definition was unhelpful to the jury. To the contrary, in order to find appellant guilty of capital murder, either as a primary actor or via party liability, the jury had to be instructed on the elements of that offense. *See Dinkins*, 894 S.W.2d at 339. The trial court did so in both the abstract and application portions of the charge. This was not error.

We conclude that the trial court did not err in defining capital murder in the abstract portion of the jury charge. Accordingly, we do not address whether appellant was harmed by the definition. *See Alcoser*, 663 S.W.3d at 165.

### 4.    *Issue 5—Intent and the Conduct Elements*

In his final charge-error issue, appellant contends that the trial court erred in failing to limit the conduct element in the abstract definition of intent. Relying on the twin cases of *Cook*[15] and *Hughes*,[16] appellant argues that the charge allowed the jury to convict him of capital murder on an inapplicable theory of liability. The State concedes the trial court erred, but argues that the error was harmless.

Section 6.03 of the Penal Code defines four separate culpable mental states: intent, knowledge, recklessness, and criminal negligence. *See* TEX. PENAL CODE ANN. § 6.03; *see also Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App.

---

[15] *Cook v. State*, 884 S.W.2d 485 (Tex. Crim. App. 1994).

[16] *Hughes v. State*, 897 S.W.2d 285 (Tex. Crim. App. 1994).

2022). "'[T]he scope of those culpable mental states is limited by the type of the offense,' which depends on the 'conduct element.'" *Id.* (quoting *Cook* , 884 S.W.2d at 487). There are three conduct elements: (1) nature of conduct; (2) result of conduct; and (3) the circumstances surrounding the conduct. *Id.* (citing *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989)). A trial court errs when it fails to limit the culpable mental state according to the proper conduct element that is the gravamen of the charged offense. *See Cook*, 884 S.W.2d at 491.

In *Cook*, the defendant was indicted for murder under Penal Code Section 19.02(b)(1).[17] *See id.* at 486. The trial court's charge included the following definitions of "intentionally" and "knowingly":

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

---

[17] The *Cook* opinion states that the defendant was charged with murder under Section 19.02(a)(1), not (b)(1). *Cook*, 884 S.W.2d at 486. This is because at the time of the murder in *Cook*, the elements of the offense were set forth in subsection (a). In 1993, however, the Legislature recodified the Penal Code. *See Strong v. State*, 87 S.W.3d 206, 214 (Tex. App.—Dallas 2002, pet. ref'd). As part of that recodification, Section 19.02 was amended by moving the elements down to subsection (b) and inserting definitions for "adequate cause" and "sudden passion" in subsection (a). *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900 (S.B. 1067), § 1.01, 1993 Tex. Gen. Laws 3586, 3613. For clarity, we will refer to the current version of the statute where applicable.

*Id.* The court of criminal appeals held that these definitions were erroneous because intentional murder under Penal Code Section 19.02(a)(1) is a "result of conduct" offense these definitions should have limited the conduct element accordingly; i.e., the charge should not have included the "nature" and "circumstances" conduct elements. *See id.* at 491.

In *Hughes*, the companion case to *Cook*, the court of criminal appeals considered the same issue for the offense of capital murder under Penal Code Section 19.03(a)(1), which involves the murder of a peace officer or fireman. *See Hughes*, 897 S.W.2d 285, 288, 295–97 (Tex. Crim. App. 1994). Similar to *Cook*, the trial court's charge in *Hughes* defined "intentionally" and "knowingly" as follows:

> A person acts "intentionally," or with intent, with respect to the *nature of his conduct* or to a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.
>
> *A person acts "knowingly," or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* at 294 (emphasis in original). In considering the elements of a Section 19.03(a)(1) capital murder, the court of criminal appeals noted that the offense included "two of the three conduct elements[,]" notably that the defendant "intentionally or knowingly caused the death of the deceased (result of conduct)," and that the defendant "knew the deceased was a peace officer (circumstances surrounding the

conduct)." *Id.* However, the State was not required to prove, and it was error to include, a mental-state instruction with respect to the "nature of conduct" element. *See id.*

Both *Cook* and *Hughes* acknowledged that some capital-murder cases would involve all three conduct elements. *See Cook*, 884 S.W.2d at 489, n.3 ("[Section] 19.03(a)(2) requires not just the intent to cause the death of an individual but also requires the defendant to have the culpable mental state necessary to satisfy the "conduct elements" of the underlying offense."); *Hughes*, 897 S.W.2d at 295 (explaining that capital murder often involves proof of other criminal conduct and therefore "it is more accurate to view it as a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder"). In a footnote, the *Hughes* opinion explains how a charge should define the culpable mental states with respect to different conduct elements when more than one has to be proved:

> Following is an example of a charge which would have appropriately limited the definitions of culpable mental state for the offense charged in the instant case:
>
> The following definition applies to mental state in causing death:
>
> A person acts "intentionally" or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts "knowingly" or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The following definition applies to mental state in knowing the victim was a peace officer:

A person acts "knowingly" or with knowledge, with respect to circumstances surrounding his conduct when he is aware that the circumstances exist.

*Hughes*, 897 S.W.2d at 296, n.16.

The following year, in *Patrick v. State*, the court applied this footnote to a jury charge in a capital-murder case involving an underlying burglary-of-a-habitation offense under Penal Code Section 19.03(a)(2). 906 S.W.2d 481, 491–92 (Tex. Crim. App. 1995). The court explained that the offense "can be viewed as including all three of the conduct elements." *Id.* at 492. That is, the State was required to prove not only that the defendant intentionally caused the death of the deceased (a result of conduct element), but also that he entered a habitation without the owner's effective consent (a circumstance surrounding the conduct element) and unlawfully appropriated the deceased's property (a nature of conduct element). *Id.* Therefore, the court held that the trial court did not err in including all three conduct elements in the mental-state definitions of the charge. *See id.* However, the court concluded that the trial court *did* err in "not limiting the additional language concerning the culpable mental state to proving the 'conduct element' of the underlying offense." *Id.*

Here, the trial court defined the culpable mental states as follows:

–41–

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial or unjustifiable risk that the circumstances exists or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actors standpoint.

We agree with the parties that these definitions are erroneous. Under current jurisprudence, the trial court should have clearly delineated which mental states attach to which conduct elements. *See id.*

We now turn to whether appellant was egregiously harmed as a result of this error. For both preserved and unpreserved charging error, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* at 492. "In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we 'may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury

charge.'" *Id.* (quoting *Hughes*, 897 S.W.2d at 296; *Cook*, 884 S.W.2d at 492, n.6); *see also Ash v. State*, 930 S.W.2d 192, 195 (Tex. App.—Dallas 1996, no pet.) ("[E]ven if an offense contains all of the conduct elements referenced in the definitions of 'knowingly' and 'intentionally,' a court errs in failing to limit the definitions to the conduct element or elements of the offense to which they apply.").

In *Patrick*, the court considered whether an error similar to the one here egregiously harmed the defendant. *See id.* at 492–93. In analyzing the jury charge in that case, the court noted that although the definitions of "intentionally" and "knowingly" "indiscriminately set forth the three alternative conduct elements," the "factual context" in which those terms appear shows which conduct element applies to which element of the offense. *Id.* at 493. The court explained:

> For instance, the application paragraph states that appellant "did intentionally cause the death of [the victim.]" The term intentionally directly modifies the phrase "cause the death". Referring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and cause the result language are the applicable portions of the full code definitions. We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense.

*Id.* We employed the same analysis in *Ash* to conclude that the defendant was not egregiously harmed by the erroneous definitions of "knowingly" and "intentionally." *See Ash*, 930 S.W.2d at 195. There, all three conduct elements were implicated, but the trial court did not limit the definitions to the conduct elements of the offense to which they applied. *See id.* However, we concluded that the defendant was not

–43–

egregiously harmed by the error. This was because the application portion of the charge, which "describe[d] the manner and means of committing the offense . . ." tended to "limit the culpable mental states to the result of appellant's conduct." *Id.*

Here, appellant argues that the trial court erred by failing to limit the conduct element in the mental-state definitions "to the concomitant commission of Aggravated Robbery that made this a Capital Murder." Appellant contends that the jury charge allowed the jury to find that Shooter acted with intent to engage in conduct that was clearly dangerous to human life—that is, a murder under Penal Code Section 19.02(b)(2)—which cannot support a capital-murder charge. *See* TEX. PENAL CODE ANN. § 19.03(a) (providing that only a murder under Section 19.02(b)(1) can be enhanced to capital murder). We disagree.

The jury charge used the "clearly dangerous to human life language" only in the definition of, and application paragraph for, murder. That was appropriate, as the jury was instructed on murder as a lesser-included offense to capital murder. The jury charge's application paragraph for capital murder, on the other hand, stated:

> Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt, that on or about 2nd day of November, 2018, in Dallas County, Texas, Edwin Hernandez, hereinafter called defendant, acting alone or as a party as defined herein, did then and there intentionally cause the death of Misael Romero, an individual, hereinafter called deceased, by shooting the deceased with a firearm, and the defendant was then and there in the course of committing and attempting to commit the offense of robbery of the deceased, then you will find the defendant guilty of capital murder.

–44–

As in *Patrick*, the word "intentionally" directly modifies the phrase "cause the death." *See Patrick*, 906 S.W.2d at 493. The abstract definition of "intentionally" included the result-of-conduct element, which is the gravamen of the murder offense. And the application paragraph "limit[ed] the culpable mental states to the result of appellant's conduct." *See Ash*, 930 S.W.2d at 195. Further, it was not error to include the other conduct elements (circumstances surrounding the conduct and nature of the conduct) because the underlying offense of robbery requires proof of those elements. *See id.* Viewing the error in light of the entire charge, we cannot say appellant was egregiously harmed.

### 5. *Summary*

We conclude the trial court did not err in including a Section 7.02(a)(2) instruction, in failing to define "conspiracy," or in including a definition for capital murder, in the charge. We further conclude that the trial court did err in failing to limit the conduct elements to their respective offenses in the mental-state definitions, but such error did not egregiously harm appellant.

We overrule appellant's fourth and fifth issues.

## IV. MOTION TO SUPPRESS

In his sixth issue, appellant contends that the trial court erred in denying his motion to suppress his recorded interview with Detective Hill. Appellant argues that his confession was coerced into making his statements because Detective Hill lied to appellant by telling him that he was subject to the death penalty. *See Roper v.*

*Simmons*, 543 U.S. 551, 578 (2005); TEX. PENAL CODE ANN. § 8.07(c) ("No person may, in any case, be punished by death for an offense committed while the person was younger than 18 years."). The State responds that Detective Hill's statements were not coercive. Based upon the record, we conclude that this issue was waived for appeal.

Although the State does not argue on appeal that appellant's contention was not preserved for our review, error preservation is a "systemic requirement" that we must review *sua sponte. Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005) ("[P]reservation of error is a systemic requirement that must be reviewed by the courts of appeals regardless of whether the issue is raised by the parties[.]")*.; see also Ford v. State*, 305 S.W.3d 530, 532–33 (Tex. Crim. App. 2009) ("Ordinarily, a court of appeals should review preservation of error on its own motion. . . ."). A defendant who files a pretrial motion to suppress evidence and obtains a ruling on the admissibility of the evidence need not object every time the evidence is offered at trial to preserve error. TEX. R. EVID. 103(b); *Estrada v. State*, 313 S.W.3d 274, 302 (Tex. Crim. App. 2010); *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986). "However, when the defendant affirmatively asserts during trial he has 'no objection' to the admission of the complained of evidence, he waives any error in the admission of the evidence despite the pre-trial ruling." *Moraguez*, 701 S.W.2d at 904; *see also Jenkins v. State*, No. 05-22-01003-CR, 2024 WL 412518, at *6 (Tex. App.—Dallas Feb. 5, 2024, pet. ref'd) (mem. op., not designated for publication). If

an issue has not been preserved for appeal, we should not address the merits of that issue. *Ford*, 305 S.W.3d at 532.

Prior to trial, appellant filed a motion to suppress, among other things, any of his "statements or admissions, whether written or oral" and "illegal recordings of [his] conversations." The trial court held a pretrial hearing in which it heard argument on the motion to suppress. Appellant sought to exclude his videotaped interview by Detective Hill. The trial court denied the motion to suppress. During trial, the State offered the same videotape into evidence. Appellant's counsel stated that he had "no objection," and the trial court admitted the videotape into evidence.

On our own motion, we consider whether appellant preserved his complaint relative to the trial court's denial of his motion to suppress. *See Haley*, 173 S.W.3d at 515. Because appellant asserted that he had "no objection" to the admission of his videotaped interview, we conclude that this issue was waived for appeal. *Moraguez*, 701 S.W.2d at 904; *Jenkins*, 2024 WL 412518, at *6. We therefore decline to address the merits of this issue. *See Ford*, 305 S.W.3d at 532.

We overrule appellant's sixth issue.

## V. TIME CREDIT

In his seventh issue, appellant avers that the judgment does not reflect the correct pretrial confinement calculation for time served and requests that we remand this cause to the trial court to calculate his time credit.

Article 42.03 of the Code of Criminal Procedure provides the trial judge shall give credit "from the time of [defendant's] arrest and confinement until his sentence by the trial court" and "the time that the defendant has spent in jail pending disposition of his appeal." TEX. CODE CRIM. PROC. ANN. art. 42.03, § 2(a)(1), § 3. A defendant is also entitled to a time credit for any time he spent in juvenile detention if he is later sentenced to prison for the same offense. *See Ex parte Green*, 688 S.W.2d 555, 556–57 (Tex. Crim. App. 1985). Article 42.01 requires that this credit be included in the judgment. *See* TEX. CODE CRIM. PROC. ANN. art. 42.01, § 1(18).

Appellant contends that the Texas Department of Criminal Justice (TDCJ) is mistakenly treating the date of the judgment as the commencement date for his confinement for the purposes of calculating the date on which he becomes eligible for parole. In his brief, appellant provides a link to his inmate information page, which he alleges reflects this error. Appellant argues that the reason for this error is likely because the trial court used the wrong judgment form. The State disagrees that appellant was not credited time for his pretrial detention. The State points out that the judgment reflects "286 BT CREDIT" though it acknowledges that this was written in the judgment's blank provided for court costs. The State does agree, however, that the trial court used the wrong judgment form and points to other errors in the judgment stemming from that mistake.[18]

---

[18] We address these additional errors in Section VI below.

Ordinarily, we may reform or correct a judgment when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). However, when there is insufficient information from which we to determine the amount of time to be credited for a defendant's prejudgment confinement, we must remand the cause to the trial court for that calculation. *Sanders v. State*, No. 05-02-01620-CR, 2004 WL 60762, at *7 (Tex. App.—Dallas Jan. 14, 2004, no pet.) (mem. op., not designated for publication).

Here, there is insufficient information to determine the time credit. Although the trial court appears to have found the time credit to be 289 days, as reflected in the court costs blank of the judgment, that number may be incorrect. Appellant was arraigned on June 24, 2021. The trial court set bail at $500,000, and there is no evidence in the record that appellant posted bail. Assuming he was confined from that day until April 29, 2022, the date of the judgment, then appellant's pretrial confinement would have been 309 days. Additionally, the record contains a Notice of Disposition, which appears to reflect that appellant is entitled to "credit for time served" from August 4, 2020 to April 29, 2022, or 634 days.

We conclude that there is insufficient information in the record to properly calculate appellant's time credit. We therefore remand this cause to the trial court to make that calculation.

## VI. MODIFICATIONS TO JUDGMENT

In three cross-points, the State requests that we correct certain mistakes in the judgment, or alternatively abate this cause and remand to the trial court to make the corrections. The State argues that the judgment is incorrect by stating: (1) that punishment evidence was submitted to the jury; (2) that the jury was charged by the court on punishment; and (3) that the jury rendered verdicts on special issues.

As explained above, the State argues, and appellant agrees, that these errors stem from the trial court using the wrong judgment form. Article 42.01, Section 4 of the Code of Criminal Procedure requires that the Office of Court Administration of the Texas Judicial System (OCA) to promulgate a standardized felony judgment form. TEX. CODE CRIM. PROC. ANN. art. 42.01, § 4; *see Rios v. State*, 665 S.W.3d 467, 472 n.13 (Tex. Crim. App. 2022) (OCA offers different judgment forms drafted in Microsoft Word based on the circumstances. . . For example, if a bench trial was held . . . the "Judgment of Conviction by Court" form would be used.").

Here, the trial court used the judgment form titled "Judgment of Conviction by Jury – Capital Murder." This was the incorrect form, as is apparent from the language in the footer of the judgment, which states, "OCA Standard Judgment Form Capital Murder – State Seeks Death Penalty." As we are remanding for recalculation of time credit, we note that the current judgment form has no blank to input the time credit. Given that a time credit is relevant only for the calculation of the defendant's eligibility for parole, which is not available in capital-murder cases in which the

–50–

State seeks the death penalty, the absence on the current form is not surprising. *See* TEX. PENAL CODE ANN. § 12.31(a). However, because the State cannot seek the death penalty where, as here, the defendant was a juvenile at the time of the offense, the State contends that the appropriate form is the one titled "Judgment of Conviction by Jury."[19]

The judgment form in the record also contains the following statements, along with check boxes that reflect the jury's options in capital-murder cases in which the State seeks the death penalty:

> The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the special issues set out in the jury charge. After due deliberation, the jury was brought into open court, where it returned its answers to the special issues as indicated below:
>
> (1) The jury found beyond a REASONABLE DOUBT that there is a probability that defendant would commit criminal acts of violence that would constitute a continuing threat to society.
>
> [x] Yes (unanimous)
>
> [ ] No (by at least 10 jurors)
>
> (2) The jury found beyond a REASONABLE DOUBT that considering all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?
>
> [x] Yes (by at least 10 jurors)

---

[19] We leave the determination of the correct form to the trial court.

[ ] No (unanimous)

We agree with the State that there is no evidence in the record that these questions were submitted to the jury. Nor could they have been, given that the death penalty was never an option. Rather, once the jury returned its guilty verdict, the trial court pronounced the mandatory sentence of life imprisonment. *See* TEX. PENAL CODE ANN. § 12.31(a)(1).[20] We conclude that the above statements—reflecting that the jury punishment evidence was submitted to the jury, that the jury was charged on punishment, and that the jury rendered a verdict on special issues—are incorrect and should be stricken from the judgment.

We sustain the State's cross-points.

## CONCLUSION

We overrule appellant's first six issues and affirm the trial court's judgment as to those issues. We sustain the State's cross-issues and reform the judgment by deleting the language therein suggesting that punishment evidence was submitted to the jury, that the jury was charged on the issue of punishment, and that the jury rendered a verdict on special issues. We sustain appellant's seventh issue and delete the phrase "286 BT CREDIT" from the blank in the judgment for "Court Costs" and replace it with "0." We remand this cause to the trial court to recalculate appellant's time credit pursuant to Article 42.03 of the Code of Criminal Procedure.

---

[20] Although the record reflects that the appellant elected for the jury to assess punishment, the trial court imposed the mandatory sentence.

We direct the trial court to prepare a corrected judgment, using the appropriate judgment form, that reflects the modifications made in this Court's opinion and judgment in this cause. *See Montoya v. State*, No. 05-22-00621-CR, 2024 WL 3897468, at *12 (Tex. App.—Dallas Aug. 22, 2024, no pet. h.) (mem. op., not designated for publication) (citing *Shumate v. State*, 649 S.W.3d 240, 244 (Tex. App.—Dallas 2021, no pet.)).

We further direct the trial court: (1) to order the district clerk to prepare and file supplemental clerk's records containing the corrected judgment with this Court; (2) to provide the corrected judgment to the parties; and (3) to send the corrected judgment to the Texas Department of Criminal Justice. *See id.*

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

220419F.P05



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

EDWIN NOEL HERNANDEZ,
Appellant

No. 05-22-00419-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 2, Dallas County, Texas Trial Court Cause No. F-2115517-I. Opinion delivered by Justice Goldstein. Justices Garcia and Miskel participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

(1) We **DELETE** the following language in the judgment:

The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the special issues set out in the jury charge. After due deliberation, the jury was brought into open court, where it returned its answers to the special issues as indicated below:

(1) The jury found beyond a REASONABLE DOUBT that there is a probability that defendant would commit criminal acts of violence that would constitute a continuing threat to society.

[x] Yes (unanimous)

[ ] No (by at least 10 jurors)

(2) The jury found beyond a REASONABLE DOUBT that considering all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

[x] Yes (by at least 10 jurors)

[ ] No (unanimous)

(2) We **DELETE** the phrase "$286 BT Credit" from the space in the judgment reserved for "Court Costs" and **INSERT** "$0" in its place.

As **REFORMED**, the judgment is **AFFIRMED IN PART AND REVERSED IN PART**. We **REVERSE** that portion in the judgment reflecting that appellant EDWIN NOEL HERNANDEZ shall be credited 289 days for time served prior to judgment. We **REMAND** this cause to the trial court for recalculation of Appellant's time credit. In all other respects, the judgment is **AFFIRMED**.

We **DIRECT** the trial court to prepare a corrected judgment, using the appropriate judgment form, that reflects the modifications made in this Court's opinion and judgment in this cause.

We further **DIRECT** the trial court to: (1) order the district clerk to prepare and file in this Court a supplemental clerk's record containing the corrected judgment; (2) provide a copy of the corrected judgment to the parties; and (3) send a copy of the corrected judgment to the Texas Department of Criminal Justice.

Judgment entered this 30th day of September, 2024.